Dorothy GAUTREAUX et al., Plaintiffs,

v.

Moon LANDRIEU, Secretary of the U. S. Department of Housing and Urban Development and Chicago Housing Authority, et al., Defendants.

Nos. 66 C 1459, 66 C 1460.

United States District Court,
N. D. Illinois, E. D.

July 30, 1980.

Alexander Polikoff, Howard A. Learner, Chicago, Ill., for plaintiffs.

Thomas P. Sullivan, U. S. Atty., Robert M. Grossman and Jeffery Jahns, Roan & Grossman, Chicago, Ill., for Illinois Housing Development Authority.

Calvin H. Hall, General Counsel, Chicago Housing Authority, Patrick W. O'Brien, Beverly J. Klein, Mayer, Brown & Platt, Chicago, Ill., for Chicago Housing Authority.

Jane McGrew, General Counsel, Dept. of Housing & Urban Development, Washington, D. C., Richard J. Flando, Acting Regional Counsel, Dept. of Housing & Urban Development, Chicago, Ill., for HUD.

Stanley J. Garber, Corp. Counsel, Earl L. Neal, Sp. Asst. Corp. Counsel, Chicago, Ill., for City of Chicago.

## CORRECTED MEMORANDUM OPINION AND ORDER

CROWLEY, District Judge.

These consolidated cases are now before the Court on plaintiffs' motion for further relief against the Chicago Housing Authority (CHA) through appointment of a receiver.

The lawsuits, initiated in 1966, have had an extensive and complex history. Plaintiffs, black tenants in and applicants for public housing, brought these actions alleging violations of their rights under the Equal Protection Clause of the Fourteenth Amendment. They charged the CHA and its executive director with intentionally violating 42 U.S.C. §§ 1981 and 1983 by maintaining existing patterns of residential separation of the races through tenant–assignment and site–selection procedures.

In 1969, after examination of thousands of pages of depositions, affidavits and exhibits, plaintiffs' motion for summary judgment was granted and defendants were permanently enjoined from continuing ra-

cially discriminatory practices.[1] *Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907 (N.D.Ill.1969). The parties were ordered to submit a plan for selection of future sites on a nondiscriminatory basis. On July 1, 1969, the court entered a supplemental judgment order containing a comprehensive plan to remedy the effects of and prevent the continuation of CHA's unconstitutional site–selection and tenant–assignment procedures. *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736 (N.D.Ill.1969). The CHA was directed to "use its best efforts" to increase the supply of Dwelling Units as rapidly as possible. *Id.* at 741. The supplemental order enjoined further construction of public housing in "non–white" areas of Chicago unless there was simultaneous construction of at least 75 percent of all proposed units in Chicago's white areas; ordered the CHA not to concentrate large numbers of Dwelling Units in or near a single location; and provided that no public housing project should contain Dwelling Units designed for occupancy of more than 120 people.[2]

For the past eleven years plaintiffs have been attempting to reap the benefits of the 1969 judgment order. Despite continuous litigation[3], numerous hearings and remedial court orders and referral to a Special Master[4], the purposes of this judgment order have not yet been achieved. In fact, because of its negligible progress in providing remedial housing to members of the plaintiff class, CHA has been charged with a callous disregard for the rights of the black, underprivileged citizens of Chicago. See *Gautreaux v. Chicago Housing Authority*, 503 F.2d 930, 932 (7th Cir. 1974).

On May 18, 1979, on joint motion of the parties, this Court entered an order modifying previous judgment orders to remove previous restrictions on CHA development plans. The order also prohibited CHA from developing public housing in the Limited Public Housing Area without simultaneous development in the General Public Housing Area.[5] The order contained three significant provisions: 1) it removed CHA's obligation to put its first 700 units in white or general public housing neighborhoods; 2) it changed the ratio of new construction and rehabilitation with respect to white versus black neighborhoods; and 3) it explicitly included elderly housing. Finally, the order required CHA to concentrate on the rehabilitation method of developing public hous-

1. A similar finding of discriminatory practices in the public housing area was made against HUD. *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir. 1971). Like CHA, HUD was ordered to use its "best efforts" to reverse the effects of its prior discriminatory conduct. *Gautreaux v. Romney*, 363 F.Supp. 690 (N.D.Ill.1973), *rev'd on other grounds sub nom., Gautreaux v. Chicago Housing Authority*, 503 F.2d 930 (7th Cir. 1974).

2. The order provided that, in unusual circumstances, a Public Housing Project could contain Dwelling Units designed for occupancy by no more than 240 persons. *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736, 739 (N.D. Ill.1969).

3. See *Gautreaux v. Chicago Housing Authority*, 265 F.Supp. 582 (N.D.Ill.1967); *Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907 (N.D.Ill.1969); *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736 (N.D.Ill.1969); *Gautreaux v. Chicago Housing Authority*, 436 F.2d 306 (7th Cir. 1970), *cert. denied*, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); *Gautreaux v. Romney*, 448 F.2d 731.(7th Cir. 1971); *Gautreaux v. Romney*, 332 F.Supp. 366 (N.D.Ill. 1971), *rev'd* 457 F.2d 124 (7th Cir. 1972); *Gau-*

*treaux v. Chicago Housing Authority*, 342 F.Supp. 827 (N.D.Ill.1972), *aff'd sub nom., Gautreaux v. City of Chicago*, 480 F.2d 210 (7th Cir. 1973), *cert. denied*, 414 U.S. 1144, 94 S.Ct. 896, 39 L.Ed.2d 98 (1974); *Gautreaux v. Romney*, 363 F.Supp. 690 (N.D.Ill.1973), *rev'd sub nom., Gautreaux v. Chicago Housing Authority*, 503 F.2d 930 (7th Cir. 1974); *Gautreaux v. Chicago Housing Authority*, 384 F.Supp. 37 (N.D.Ill. 1974), *petition for writ of mandamus denied sub nom., Chicago Housing Authority v. Austin*, 511 F.2d 82 (7th Cir. 1975).

4. *Gautreaux v. Chicago Housing Authority*, 384 F.Supp. 37 (N.D.Ill.1974), *petition for writ of mandamus denied sub nom., Chicago Housing Authority v. Austin*, 511 F.2d 82 (7th Cir. 1975).

5. "Limited Public Housing Area" is that part of the County of Cook in the State of Illinois which lies either within census tracts of the United States Bureau of the Census having 30% or more non–white population, or within a distance of one mile from any point on the outer perimeter of any such census tract. "General Public Housing Area" is the remaining part of the County of Cook in the State of Illinois. *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736 (N.D.Ill.1969).

ing by providing that 300 units be rehabilitated and 100 units be newly constructed.

On August 31, 1979, the Special Master, Magistrate Olga Jurco, rendered her final report and recommendations.[6] After conducting 68 hearings, beginning in March, 1975, and reviewing an extensive report of an urban consultant employed to assist her in evaluating the precise causes for the delay in implementing the judgment order, the Master stated that the CHA had failed to aggressively take all practicable steps to comply with the 1969 judgment order. However, the Master noted that delay was also attributable to factors not completely within the control of the CHA or HUD and concluded that the CHA had finally accepted the course of conduct it must follow. Although noting the CHA's inefficient bureaucratic operation and inability to re-evaluate its criteria for suitable remedial housing was responsible, in large part, for the long delay, the Master did not recommend appointment of a receiver.

The Master made several recommendations. She suggested that CHA's site search be concentrated in the General Public Housing Area as well as the Limited Public Housing Area, and that HUD repossessed properties be used in the rehabilitation program. Additionally, she recommended that CHA take advantage of Article X of the 1969 judgment order [7] to permit modification of that order to allow proposed developments designed by CHA alone or in combination with other private or public agencies. In addition, she recommended that the CHA hire additional personnel to work solely on land site and building availability.

In support of the motion to appoint a receiver, plaintiffs assert that, as of December 18, 1979, CHA has neither authorized the acquisition of any land or buildings for the General Public Housing Area nor submitted any requests for HUD approval of proposed housing to be developed on land or buildings acquired by CHA prior to the May, 1979 order. They claim that CHA has shown no progress in implementing the May, 1979 order and maintain that, as a result of CHA's failure to show reasonable progress in complying with the May, 1979 order, HUD intends to withhold public housing funds for the fiscal year of 1980.

CHA responds that past delays have been caused by normal bureaucratic procedures and that since the removal of procedural obstacles, CHA has increased its efforts to comply with both the original July, 1969 order and the May, 1979 order. CHA claims that in the past HUD prototype cost limits, the dollar amount CHA may spend in building new apartments, prevented it from building more than 114–117 units by the new construction method. It claims that changes in HUD prototype construction cost limits, which were raised 50% in June, 1979, will enable housing development plans to proceed more rapidly in the future. It also states that since the May, 1979 order, CHA has hired new people, set up a new functional office within the office of the CHA and plans to hire additional staff in the near future.

An evidentiary hearing was held at plaintiffs' request for the purpose of deciding if the extraordinary remedy of appointing a receiver was either necessary or appropriate to achieve compliance with the May, 1979 order. The Court has reviewed the testimony and arguments presented at the hearing and carefully examined the exhibits proffered by the parties. It makes the following findings of fact and conclusions of law.

---

**6.** The Special Master was appointed under a Reference Order of Judge Richard B. Austin in November, 1974.

**7.** Article X provides:

*This Court retains jurisdiction of this matter for all purposes, including enforcement and the issuance, upon proper notice and motion, of orders modifying or supplement-*

*ing the terms of this order upon the presentation of relevant information with respect to proposed developments designed by CHA alone or in combination with other private or public agencies to achieve results consistent with this order, material changes in conditions existing at the time of this order or any other matter.*

Without recounting the minute detail and numerous statistics presented at the hearing, it is clear that CHA's record for the past eleven years is far from impressive. CHA utilizes two methods of developing public housing: 1) acquiring vacant land and building on the land (the new construction method) and 2) acquiring existing buildings and rehabilitating them (the rehabilitation method). From 1969, only 114–117 apartments were developed by the new construction method. Since 1977, when the rehabilitation method became available, CHA has not acquired and rehabilitated a single building.

While pre–1979 prototype costs created some obstacle to building new apartments, the evidence indicates that CHA could have ameliorated this obstacle and reduced the per–unit costs by creative planning. Per-unit costs could have been substantially reduced by acquisition of sites which would accommodate larger buildings and by combining family housing with elderly housing, which is cheaper to build.

Since the May, 1979 order, CHA's statistical record has improved only slightly. No building has yet been rehabilitated and turned into public housing in the General Public Housing Area. Nor has any building been placed under rehabilitation physical reconstruction work. On January 8, 1980, five buildings previously ordered to be acquired for the General Public Housing Area were sent to HUD as part of a development program, and 21 buildings were authorized by CHA commissioners for acquisition in the General Public Housing Area. Of the 21 buildings authorized, 18 of them were buildings identified by two community organizations, the Organization of Palmer Square and The Heart of Uptown. At the time these 21 buildings were identified and being submitted for approval, no other CHA acquisition efforts were being conducted.

The fact that CHA has not been assigned HUD funds for the fiscal year of 1980 is due not to the fact that CHA has failed to show sufficient progress in developing housing units under the May, 1979 order, but because the Area Manager determined that other Illinois Housing Authorities demonstrated a greater unfunded need for the available funds. Affidavit of Elmer C. Binford, Area Manager, Chicago Area Office, United States Department of Housing and Urban Development, p. 4.

While the Court is not satisfied with the efficiency or the extent of CHA activity at this time, CHA's recent attempts to comply with the May, 1979 order evidence some efforts to cure its inefficient bureaucratic procedures. Major obstacles to the development of public housing have been removed. Procedural roadblocks have been removed and prototype construction cost limits have been raised. The regular January 8, 1980 meeting and the special meeting on January 16, 1980 is indicative of the increased pace at which CHA can move when it feels the pressure to do so. Moreover, with its increased staff, and the benefits of the suggestions of the urban consultant and the Special Master, the CHA has every opportunity to finally render the relief to the members of the plaintiff class which they so justly deserve and which is so long overdue.

With great reservation, the motion to appoint a receiver is denied without prejudice. The CHA is directed to make an immediate and substantial start toward full compliance with the May, 1979 order within six months. Best efforts will no longer suffice; compliance will be measured by results, not intentions. Bureaucratic inefficiency will no longer be tolerated by the Court. The inaction of the CHA to date is a clear indication of indifference to the orders of this Court and to the rights of the citizens of Chicago. Difficulty in attaining racially integrated public housing shall not be further condoned. If the bureaucratic operation of the CHA does not permit prompt or imaginative positive action then the duty of the CHA is clear. It must adopt new policies. Policies which permit and encourage action. Policies which have only one goal, compliance with its duties. The CHA must have only one concern, housing in compliance with the repeated orders of this Court.